My understanding is we've got the three defendants and we also have a government appeal. So generally speaking, that means both of you have rebuttal on your own issue. And so there's always questions about – I'm still – you each still have 20 minutes. So in terms of – I'll allow you some flexibility in terms of – I mean, I think it's fairly easy in terms of how they break down because, one, we've got – the government's cross appeal is a sentencing issue and your issues are essentially trial issues. So if you tell me how you want to approach that, just know you have basically 20 minutes to figure all of that out. And you've got rebuttal on your issues and he's got rebuttal on the cross appeal issues. Your Honor, Dennis Reardon for the – all defendant appellants. I'm going to try and reserve a couple of minutes, and I won't address the government's appeal during my initial remarks. Okay. I'll rebut or reply to their arguments on the main issues. Honestly, if we have any questions we don't feel were answered, we have the authority to give the additional time to answer those questions. So go ahead and proceed. Thank you, Your Honor. As to the defendant's lead public trial claim, I'm not going to spend a lot of time on first constitutional principles, fundamental constitutional principles, because the government apparently agrees with our recitation and analysis of the major Supreme Court cases. They don't even discuss them in their brief. That is to say, under Presley v. Georgia, you cannot exclude the public from voir dire. You can't do it because you need the seats for the veneer. You can't do it because you're afraid of contamination. You have to make a remedy that has the public there during voir dire. Oliver and Presley make clear that the ban on the exclusion of the public applies with particular force to relatives and families of the defendants, and everyone agrees that if there is a constitutional violation, there's no consideration of harmlessness. It's a structural error that requires reversal under Waller and Presley. It would seem, though, that you have to, where I sort of focus this, is that you have to show an intentional or affirmative courtroom closure pursuant to judicial act or order for a nontrivial duration. And we also have this settlement order or settling order. Where do you find, show me in the settling order, where do you find support for that? Oh, Your Honor, let me be clear. If we had to show a judicial order to close the courtroom, we'd lose. But this court would have to make a remarkable decision if it did that. It would have to say that if the marshal's office physically beat and prevented every member of the public from entering the courtroom, but the judge didn't give an order to it, the Sixth Amendment right to a public trial had not been violated. Well, but it seems that Shyrock does require an intentional closure. No. Not an effective courtroom closure, or it doesn't completely eliminate that. No. Your Honor, I respectfully submit that what Shyrock said, it was a situation in which they had voir dire and the courtroom had public members in it, but it didn't have enough seats to accommodate as many people and friends of the public as the defendant wanted. There was no action by the government other than the size of the courtroom to keep anybody out of the courtroom. Your Honor, I submit that, in fact, the term in Shyrock is action by the court. And, Your Honor, it doesn't say judicial order. It says an action by the court. We all refer to the marshals as courtroom security. We refer to the court clerk. If the court clerk or the marshals keep the public out of the voir dire, then the right to a public trial has been abridged by government action. Your Honor, I know you're an experienced criminal defense lawyer, and so you're not a stranger to the courtroom. And standard procedure on cases is when you do voir dire, you know, courts like to, you know, you call all the jurors up and generally there's a big speech you give to everyone before you start putting them in the box and doing the individual part of it. And so in that initial part of it, a lot of times on a, particularly in a case that has, there's quite a few people, jurors that you have to call up just to get a group, you know, to sort of whittle it down. And if you don't bring up a lot, then it means every time then you have to start your speech over again as far as that goes. And so this isn't an uncommon situation that comes in trial courts when you're calling jurors up. And you have, and, you know, both of the lawyers know that jury selection is going on, and no one really seems to call any of this to the court's attention. Your Honor, but what you just said failed to distinguish between the orientation of jurors, and there's no claim here that you can't fill the courtroom for the purpose of the orientation of jurors, and voir dire and jury selection. And the United States Supreme Court said in Presley that it's too bad if your courtroom only has as many seats as the veneer. You have to split the veneer in part. You have to provide, you know, during the Bonds trial, obviously there was an enormous amount of interest. There was a separate courtroom where to accommodate the public, Judge Hylston ensured that some seats in the actual courtroom were available to family and public. The constitutional rule is that the government cannot close jury selection. Was this case tried in Saipan? Yes. Was this tried in the district courthouse and courtroom in Saipan? Yes. And have they built a new courthouse in Saipan? Well, all I know is that it was tried in a very weird courtroom. Yes. Which is described in a great deal of those photographs of it in the Judge Bennett's report. It's a very small courtroom. It is, but the thing about this is that the judge made a finding that there was an entire section of the courtroom that was roped off, which could have been used for the public, was never used for the public during jury selection. But, Your Honors, I'll be frank. If the court holds that it's only a judge that can violate the public right, the right to a public trial, we lose. But the court then has to say that if the marshals nailed the courtroom door shut every day to keep the public out of every aspect of a trial, it would not violate the Sixth Amendment. Well, but I'm go ahead. I just want to understand what exactly it is that we're we have no order closing the court. We have a very small courtroom. And the exclusion was exactly what is the conduct that we are saying is the exclusion? The marshals kept every member of the public out of the courtroom during the entire war deal. Judge Bennett's order is clear. They closed off the main entrances to the courtroom for security reasons. There was one side door, which was the only door that a member of the public could get through. The marshals did not allow any member of the public through that door. There was no member of the public present during the entire war deal. Family, friends, anyone else. And the marshals were letting through who? Only prospective jurors and defense counsel. Well, and at some point there was, yeah, and at some point the defense team was sitting in there, and there wasn't a, was there some press or something as chairs freed up? No press. No press, Your Honor. There's a specific finding that the press was not present during the war deal. No, this was extra part of the defense team that was taking seats for the public? The defense team was at the defense table. They were not in the seats in the courtroom. Well, but there were some other seats that freed up, and some people were sitting in that. No, Your Honor, you have factual findings that no member of the public entered the courtroom during the war deal. I thought that the factual finding was there's no credible evidence that any members of the public were allowed into the courtroom. No, the finding. Didn't they say that no one ever entered, only that there's no credible evidence they did. No, the finding at the close of the hearing, and I quote to ER 573, 574, the evidence is overwhelming that no member of the public was allowed in during the jury selection. At 572, they were excluded by virtue of application of one standard operating procedure of the marshal's office. It was to a policy. And now, quote again, there's no question of that. And if you look at footnote 6 and page 27 and 28, the court specifically says there's affirmative evidence that nobody was let in. There were witness testimony that no member of the public was there. And on the other side, there was no credible testimony that the marshal let any member of the public into the courtroom. I'm trying to get the picture here. So the counsel is there. The judge is there. There are prospective jurors who are coming in. There was never any objection made by counsel that the public was being barred? No. We have a finding that the defense counsel, there was no evidence that they knew the public was being barred. Well, we don't know that the public – well, the marshal's office was not admitting members of the public. We know that. Yes. Yes. And they were admitting only the prospective jurors. Yes. In fact, the government – I'm sorry. Go ahead. And that was – was that – I'm sorry. Was that was pursuant to what, their own policy? Their own policy. And this was a highly public corruption trial in which there was a great deal of public interest. Extremely controversial public trial. Your Honors, look at this. At page six of the government's brief, it concedes that there was a constitutional violation here. Because it says at page six that everyone agrees that at the beginning of Wadir, only prospective jurors were in the courtroom. During the first day, there were 96 prospective jurors. They occupied every seat. Right. There was that. Then it says, as jurors were excused, security staff consolidated the remaining jurors and moved them forward to make space for the public. Deputy Marshal Calvert testified that on the second day of Wadir, two pews were cordoned off for the use of students, defense, and court staff in the media. So – Now you're reading from the government's presentation of the facts, Your Honor. They never, ever refer to the fact that the judge, the experienced judge who conducted a two-day hearing, made an explicit finding by overwhelming evidence that no member of the public was let in by the marshals. Okay. Did this same experienced judge make any finding about any initiation or ratification of the acts which are here alleged by the trial court? As I read his findings, he never did say anything about initiation. Seems to me you've agreed with that. I don't find anything in there about ratification either. No, Your Honor. His findings are that – In fact, one might look at his findings and suggest that the trial judge had no knowledge. I'm – I think that's absolutely correct, Your Honor. I think that we have factual findings that he had no knowledge. There is a finding that given that he knew all seats were being filled by prospective jurors, he should have known that no members of the public were there. But, Your Honor, let me be clear. If – I mean, my worry is that where we're going here is that we need to look at the factual findings. I worry about what he did under a 10e motion. I frankly don't know where they got to bringing in all this evidence on a 10e motion and where they got to. But let's assume that there was no problem with the hearing, and now we have a 10e motion. I've got to look at the facts as he found them. And it seems to me that he didn't find any ratification by the trial judge. He, in fact, may even suggest the trial judge had no knowledge. He – and you argue, essentially, that the defense counsel, based on his idea, didn't have any knowledge about this. So we find the defense counsel and the trial judge in the same spot, do we not? I agree. Okay. I found it a little uneasy because the first request to do something here, when reading about that first request, quoted counsel in their recollections of what went on that day. It didn't quite seem they didn't know anything about it. Your Honor, I think that the factual findings on that – I mean, the judge's factual findings I'm bound with. I know that. But I worry that there's nothing in there to suggest the judge had any knowledge whatsoever, and you're wanting this to be an order that I'm now going to impose on this particular courtroom situation. And yet you want me to be bound by that the judge Bennett found that the defense counsel didn't know anything about it, but defense did. And yet, when I read what the first request was from the counsel, they were talking about their quoted recollections, which is absolutely contrary to what Judge Bennett found. Well, it's not for this reason, Your Honor. It was a year later. The assertions made then were what they had learned during the course and after the trial when they were talking to family and friends and so forth. He is quite correct that there was no indication at the time that this occurred that they had any more idea than Judge Bennett did that this had occurred. What's the authority that says that the counsel says nothing, the judge doesn't know, and yet there's no objection made, and something happens like this, we have to reverse? What is the closest case that you have? Well, we quote authority in our brief, Your Honor, and I can turn to the citation, that says it doesn't make any difference who violates the public trial, right? The question is, was a public trial held? And, you know, the Supreme Court has said, in quoting Bentham and Oliver, that this is the single most important guarantee against government oppression. And to hold that a judge is ignorant of what's going on and the court staff and the executive branch through the marshal's office keeps every member of the public out of there, that's a constitutionally acceptable trial. Let me ask you another question. Are there any facts that tell me how long the closure occurred? Yes. The judge makes a specific finding that there was never any member of the public in during the entirety of the voir dire. So the voir dire was the end of this? Yes. Everything was okay after that? Right. This is a Presley case. I'm just trying to make sure. Yeah, no, let me be clear on that. It's a Presley case in terms of the closing of voir dire. But it's also a case that illustrates how important that is, Your Honor, because as you know from our other issue, there's an issue about whether jurors were candid during voir dire, and that's one of the reasons the public trial exists. Your Honor, if I can, let me sum up where we are in the constitutional case. If the judge is required to be the agent who violated the constitutional right to a public trial, we lose. If the federal government through the executive branch and the marshal's office can violate a public trial right, there was a violation of a public trial right here. But I need to address the Tenney question quickly because I know it concerns the court. If the effect is to keep the public out, then you win. Absolutely. But because that was the effect for at least the first day. But the question is the case doesn't go quite that far to say. It's not the effect of an act of God, and we'll get to that, or a hurricane. It's government agents keeping the public out of the entirety of the voir dire. In Presley, the court ordered the member of the public out. Isn't that correct? That's correct. Yes. That's correct. So in that sense, your deal. Are we really arguing between we follow the Seventh Circuit and Walton, or we follow the Tenth Circuit and Al-Somdy? Well, in terms of which issue? The agency issue, Your Honor? Yeah. Your Honor, I submit that you're following the United States Supreme Court, which says that you. Well, I understood the United States Supreme Court, and since then, I've got two circuits who are trying to see what they really said. Well, now you're saying neither one of them are right. I should go my own way. I'm saying that under our view, we have factual findings that the United States government, the executive branch through the marshal's office, kept every member of the public out of the voir dire, and that's as good as a judge doing it in Presley, and that it makes no sense to say that a judge can violate the public trial right, but other agencies of the government can't. Well, it seems a little tough. I mean, the ultimate of your argument is the courtroom is under the total control of the judge. The judge can be in charge of whatever goes on when it's there. I've been there enough to know. There's nobody going to give me any sass about what goes on in my courtroom. So the bottom line of your argument is that even if I don't know what's happening, it nonetheless is a closure because nobody says anything to me but the marshals, based on some activity that they have, which is the normal activity that I presumably have set for them, that that's a closure. Well, Your Honor, the Supreme Court cases are rife with cases that hold that, for instance, the United States attorney, the FBI, and so forth, cannot violate the constitutional right. I'm not talking about them. They're not under my control at all. You've got one of them who's going to stand up and argue. Well, Your Honor, Presley does say this. It is the affirmative obligation of the judge, absent any suggestion, to ensure alternative means of seeing that the public is in the courtroom. Well, I understand that. Well, I think you've answered my question. We're in a dilemma here because I think that if the court doesn't think that any questions are important or relevant, then I'll sit down. If its decision is going to turn on those, at some point I'd like to even briefly address the Tenney question. Well, I wouldn't mind him giving us something about them, though I will tell you that Tenney seems to be a discretionary question with the trial judge. Right. Let me say this. Tenney, you can't rule the way the government wants you on Tenney for three things. First, the one that this court has talked about a lot, the plain words of the statute, what occurred in the district court. Secondly, their position that it was fine to have a Tenney hearing, which they now take, but not to reach the question of actually whether jurors are excluded is absurd for reasons that I could explain. You can't have the hearing they wanted without addressing the question of whether jurors were excluded. It's inextricably entwined. And the third reason is save the government for itself. It needs the very power under Tenney that it's trying to block the defendant from having, because if it loses it, you can have a situation where the record reflects that the marshals came in and stripped the whole courtroom of every member of the public, and the defendant screams on appeal, this was a violation of my rights, and the marshal would say, there was a bomb scare. We cleared it for a half an hour. People may not have come back, but the last thing we intended to do was violate the right. They need Tenney in that situation, and it just perverts the wording of the statute to say that the government can't get it in that context. I realize that there's a lot. Sit down now. I'll give you two minutes. All right. Thank you, Your Honor. I'll restore your two minutes. Good morning. Good morning. Anthony Vitarelli for the United States. May it please the Court. By holding an extensive evidentiary hearing on an issue not considered by the trial judge, the District Court exceeded the scope of Rule 10e. This Court, therefore, should strike most of the supplemental findings and find that appellant has not proven a public trial violation. In any event, because they forfeited this issue, appellant has even failed to prove its burden that the error was not plain, assuming all the supplemental findings are correctly before the Court. Furthermore, appellant has failed to prove that it seriously affected the fairness and integrity of the public proceeding. The Tenney issue is critical here because, as this Court has consistently held, that is a rule to be narrowly construed. As Judge Smith noted, it is a discretionary matter for the District Court, but here, in its broad, expansive interpretation of 10e, it abused its discretion. What 10e is intended to do is to create a record such that the Court of Appeals can adjudge questions of law based upon what occurred at the trial court and what matters were considered by the trial judge. For instance, if there was a telephonic conference between the parties and the trial judge that was not transcribed, 10e could be used to create a transcript of that. If there was a piece of evidence that was admitted in trial but had been not filed with the clerk or lost, 10e could be used to reconstruct what that evidence was. If the recording equipment failed during a witness's testimony, 10e could be used to create a record of what that testimony was. This is a far afield from that. This is a matter that the defendants, if they wanted a record on this, the appropriate method would be for them to have objected. They did not do so, and therefore, this Court's review on this issue is only for plain error. The appellants here have failed to show that that error was plain under Presley. While we disagree with the appellants regarding the question of whether a volitional closing of the courtroom is required for a public trial violation, this Court doesn't need to reach that question. The Court can determine that because Presley was a case that involved a volitional closing, that any error under Presley here was not clear and obvious and therefore would not constitute plain error. There's also a significant disagreement between the parties on which much turns in this case, and that is the manner in which Judge Bennett's settlement findings are to be interpreted. Now, again, assuming the validity of that proceeding, if that proceeding is valid, Judge Bennett basically made a series of two kinds of findings. On the one hand are affirmative, factual findings in the form of things like this, I find that there was no order to close the courtroom. That is a factual finding on which this Court can base conclusions of law. That appears at ER 36. Similarly, the factual finding that the defendants should have known or knew that the public was excluded. That is a factual finding that is now before this Court on which it can base conclusions of law. There is a second kind of statement contained in the 44 pages at ER 1 to 44 in the form of the following, I cannot find that, for instance, any portion of the north segment of the courtroom was opened during the second day of jury voir dire. I cannot find that any member of the public was allowed in during jury voir dire. In a proceeding where the defendants had the burden of proof, a statement from the district court that he cannot make a finding does not equal a finding. My friend's argument is that those negative statements quote, necessarily imply the positive statement that they seek on which to rely. What, if you will, significance do I give to the fact that it was the Ninth Circuit, our own court, which sent this back for the district court to determine whether there was a difference over what occurred in requiring settlement of the record? Well, the order from the Ninth Circuit, of course, doesn't go into great detail on what the scope of that proceeding is. I think the appropriate way to understand it is that given that the issue was forfeited, the appropriate scope of the Tenney proceeding was to determine whether there was a plain error. The only way this error could have been plain is if there were a volitional closing of the court by the trial judge. That question of fact, as Judge Mossman concluded later, was correctly before the district court in the Tenney proceeding, and at page 26 of the record, he concluded that Judge Mossman had not volitionally closed the courtroom. That's the only way the error could have been plain, and that was the appropriate scope of the Tenney proceeding. The Tenney is tricky because, you know, obviously there are things that go on, and then if there had been a perfect record of things that go on, then we don't ever have to do this because it's in the record and there's no need to do it. And someone could say, well, I said this, I said that, well, then you would know, and then the court has to. But here it does sort of expand. There's no two ways about that. But I guess in terms of all of those things were in fact really going on, it just is did anyone really know about it, did anyone really do everything? And so I cannot find, I guess your argument is that essentially what he was saying, there's not sufficient evidence for me to make this finding, so therefore that's not a finding. And so we have to, if we say that the scope of the Tenney was such that the judge did not abuse his discretion, then the I find we must defer to, the I cannot find, take those out of the equation because essentially the judge was saying there isn't sufficient evidence for me to conclude that. That's absolutely one way to look at it. An alternative way to look at it is to say the findings are all, or the order is completely sufficient, again, if it wasn't an abuse of discretion in totality. But just regard the statements where he said I cannot find as non-findings. Well, what authority, and I was asking Mr. Reardon this, that is there any authority suggesting that an effective closure, meaning it had the, you know, just letting jurors in first until you started getting more room in the courtroom, and the court did find that there was an effective closure, correct? The court found that the effect of the policy was to, was that at the beginning of jury voir dire, there were no members of the public in the courtroom. So is an effective closure without intent enough to show a Sixth Amendment violation in terms of, is there any authority to that effect? Yes, from the Seventh Circuit and the Second Circuit, and it's cited extensively in the appellant's briefing. Briley from the Seventh Circuit, Smith from the Second Circuit. Owens from the First? Yes, Owens from the First, to be sure. So there is certainly authority on both sides. Shryock cited Al-Samdi from the Tenth Circuit to suggest that there was a requirement that the closure be volitional on the behalf of the district court. We think that is a more challenging question than need be resolved today. Well, are we, given this is a TANI hearing, are we really looking at the first motion ruled by the district judge? Pardon me, Your Honor, when you were speaking? Well, the district judge first had a chance to determine whether the trial was closed, and he ruled it wasn't, correct? He ruled that there was no basis for bail pending appeal in light of a trial closure, but that rule did not. But that isn't really in front of us, is it? That's not before the court, no. So what is in front of us as the motion we are to review? Well, I mean, it's a fascinating question because this is why it's paradigmatically in the plain error posture, because there is no ruling of the district court on this question. And that's why there's really no decision from the district court to review. So that's why it's a plain error review, correct? Correct. And on this plain error review, then we take on, as I understand it, all of this different law and what it means and what it says, but it doesn't seem to me that even on plain error review, this court need to come down with an exact rule on this particular situation. That's absolutely correct. The court can simply say that given the constellation of precedent, it was not clear and obvious that what occurred here affected a Sixth Amendment violation. Alternatively, the court could say, even assuming all the 10E findings were appropriate and even assuming there was error and it was plain, the court can exercise its discretion under the fourth prong of plain error to say that in a case like this, where the courtroom was literally bursting at the seams with uninterested observers, that any error would not have seriously affected the fairness and integrity of public proceedings. And in response to the appellant's 28J letter filed yesterday in which they attempted to distinguish the Barrow's case from the D.C. Court of Appeals, which reached a similar ruling, we recognize that there is authority from the Ninth Circuit to suggest that for structural errors, it is a high bar to cross for the fourth prong of plain error. I believe the phrase that the court used was that the court cannot imagine a structural error that would survive the fourth prong of plain error. We would submit that the third and fourth prongs of plain error review have significant independent purpose and meaning. And that's been the guidance from the Supreme Court from Bolano, Johnson, Cotton, Puckett, and Marcus all the way down the line, that that fourth prong is an independent inquiry. And we're not resting anything, of course, on the third prong of plain error here. But we are suggesting that if you interrogate the values that the Sixth Amendment is intended to protect, and that is to ensure that trials are not held in secret, that they are not held in camera, that the public exercise an antiseptic function on the conduct of the government and the conduct of the trial judge, those values were secured here. If we are to assume, as the defense would have us believe, that no one in the court thought that the public was excluded, then everyone would have been acting as if the public was there. I also just want to correct a couple of – want to refine on a couple of points that Mr. Reardon mentioned regarding some of the findings that were made. And I think, again, we're getting to the difference between the affirmative and negative findings of the settlement of the record, for instance, regarding the finding that the section was roped off. On the second day of jury veneer, there were only 55 jurors present in a court and that accommodated at least 91. Now, he did make a finding that – or, excuse me, he made a negative finding that there was no evidence that the North section was available for public seating. And we simply, again, reiterate that in a proceeding where a party has the burden of proof, a statement that there is insufficient credible evidence to reach a finding does not equal the opposite of that finding. If the court has no further questions on the public trial issue, we'd like to address the issue that the government has raised regarding the double counting of the sentencing enhancement. And this is a straightforward statutory interpretation question as to whether the base offense level is impermissibly duplicative with a four-level enhancement for an individual being in a high-level decision-making position. And if the court just considers kind of the Venn diagram of people that would be encompassed by the base offense and then consider the very narrow group of people that would be encompassed by the four-level enhancement, it's clear that this wouldn't constitute double counting. The commentary of the sentencing guidelines regarding the enhancement regards that the enhancement is only for people characterized by a direct authority to make decisions for on behalf of a government, department, agency, or other entity, or by those having a substantial influence over the decision-making process. That is simply a significant, significant, significant difference between any public official. Second, the base offense level is for the defendant, the nature of the defendant. And the enhancement regards the offense and whether the offense involved a person in a high-level, sensitive decision-making position. Here, the enhancement would be warranted for either Mr. Villa-Gomez or Secretary of Commerce Santos. So there's an alternative grounds on which this would be permissible and not double counting. And just one final point regarding the standard of review on the sentencing issue. There's obviously disagreement among the parties, but we just make clear that under any standard of review, we think that this is not double counting for the reasons we just stated. If the Court has nothing further, I deserve the balance of my time. Okay. I have just on your sentencing issue. So the Provision and Dispute, U.S.S.G. Section 2C11BB3, adds four points if the offense itself involved high-level corruption. If the offense involved an elected public official or any public official in a high-level decision-making or sensitive position, increases by four levels. This subsection applies the four-level increase to all defendants involved in the crime of high-level corruption, whether a public official or otherwise. Is that correct? It applies it to the defendant being sentenced if his offense involved those kinds of officials. Okay. Any further questions? No. Thank you. A couple of quick points. The government asked the Court to ignore the specific finding that I read to the Court at the close of the hearing that Judge Bennett found overwhelming evidence that everyone was excluded during the entire veneer if you look at footnote 6, he specifically says that the lack of evidence that any court personnel let anybody in is consistent with the testimony, affirmative evidence, that no one was let in. So clearly there's a very specific finding that by overwhelming evidence, no one was let in during a voir dire. If the Court looks at page 11 and 12 of our brief, it will find that there are a series of I'm sorry, I may be quoting the wrong page, 11 to 12 of the reply brief. The First Circuit, as Judge Schmitz has said. You're talking about the reply brief? Yes. Wiley, the First Circuit, the Second Circuit, the Seventh Circuit, hold specifically that it doesn't matter who does it. And they deal with it. They say security personnel can commit the violation. The two cases that we're talking about, Shyrock and the one that it relies on, neither of those involved the situation. And certainly Shyrock didn't, where there was any accusation that the marshal's office had barred people from coming into the courtroom. So the government is asking this Court to create a major circuit split based on no authority from this circuit to support that decision. On the part of Shyrock that's some concern, I hate to take your time, but it seems to me that Shyrock is as close to I have as precedent directly on point. And I guess I'm still having a tough time finding out why Shyrock doesn't really say, this has got to be something cognizantly done by the judge. Well, Your Honor, there certainly is no allegation there. It talks about the Court, that Court personnel can do this and they can violate the Constitution, but they're given a free pass if a judge is ignorant of what they're doing in his courtroom. And I distinguish it on that ground. Consider this on the Tenney question. When Judge Bennett held this, he found out that the jurors were excluded. There was no one in the courtroom. The public was excluded. It wasn't the judge's fault. But what had occurred was that a mass of people arrived for the trial. There was a report of a hurricane. They all left and didn't come back. That's the explanation of why people weren't there. The government would say, if we came to you and said you can't listen to the hurricane evidence, you'd laugh at us. And the government would say, of course you can. That's the reason why people were absent there. If you can consider that the marshals didn't do anything wrong, you can consider whether the marshals did do anything wrong under Tenney. And as to the fairness element of plain error, if you got there, there is simply no right that is less conducive to the notion that it didn't affect the fairness of the proceeding when the United States Supreme Court has repeatedly said that the public trial right is what ensures regularity on the part of witnesses, judges, jurors, and so forth. So it can't possibly be dismissed on that. Finally, ten seconds. On the sentencing issue, we argued that not only we have our double-counting issue, that there were different factual bases here, but we said there's also a harmless error test under Ali, which this Court follows. You have to prove that the error was prejudicial in the sense that the judge would not have the record does not establish that the judge would have imposed the same sentence under 3553. The judge says he would have imposed that sentence, a fair sentence, under 3553. The government hasn't even answered the harmless error part of the error equation. The government isn't usually in the position of having to show prejudice from error, but it didn't in this case. Well, the government actually has a little bit of time left if they want to use that for rebuttal. Simply regarding the harmlessness point, Your Honors, the government asked for a 180-month sentence. In this case, the sentence was 87 months. If the enhancement had been applied, the range would have been, I believe, 135 to 162 months. The record shows that what the district court stated was that 87 months was the lowest guideline sentence that complied with the 3553A factors. There's not the kind of affirmative evidence that we've seen in other cases where the district judge seems wedded to a particular number irrespective of other considerations. Here, we think the record speaks for itself in that the sentence was informed by the sentencing range. And then we would submit. Thank you. Thank you both for your argument in this matter. The court will stand at recess until tomorrow at 9 o'clock.  All rise. Thank you. The court for this session stands adjourned. Thank you.
judges: Schroeder, Callahan, Smith